**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CLIFFORD J. GRAF, | : | Civil Action No. 01-3011 (MLC) |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| TERRANCE MOORE, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**APPEARANCES:**

> CLIFFORD J. GRAF, #284016B, South Woods State Prison
> P.O. Box 6000, Bridgeton, New Jersey
> Petitioner Pro Se
>
> PATRICIA B. QUELCH, Assistant Prosecutor
> LUIS A. VALENTIN, MONMOUTH COUNTY PROSECUTOR
> Court House, 71 Monument Park, Freehold, New Jersey
> Attorney for Respondents

**COOPER**, District Judge

Petitioner, Clifford J. Graf, filed an Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254(a) challenging a conviction and sentence imposed in state court on March 7, 1986. This Court dismissed the Amended Petition as untimely and granted a certificate of appealability.  The Court of Appeals for the Third Circuit reversed this Court's Order dismissing the Petition and remanded for a determination on the merits.  See Graf v. Moore, 214 Fed.Appx. 253 (3d Cir. 2007).  Respondents thereafter filed a Supplemental Answer and a copy of the state court record; Graf filed a Reply and a Memorandum of Points and Authorities; Respondents filed a brief in response to the Reply; and Graf filed

a letter.  This Court will now dismiss the Amended Petition with prejudice on the merits and deny a certificate of appealability.[1]

## I.  BACKGROUND

Graf challenges a judgment of conviction entered in New Jersey Superior Court, Monmouth County, on March 7, 1986, after a jury found him guilty of murder, armed robbery, theft, and unlawful possession of a weapon.  See State v. Graf, No. 945-7-85, J. Conv. (N.J. Super., Law Div., 3-7-1986).  The Law Division sentenced Graf to an aggregate term of life imprisonment plus four years, with a 32-year period of parole ineligibility.  Graf appealed, and the New Jersey Appellate Division affirmed.  See State v. Graf, No. A-3940-85T4 slip op. (N.J. App. Div., Apr. 14, 1988).  The New Jersey Supreme Court denied Graf's petition for certification on September 7, 1988.  See State v. Graf, 113 N.J. 337 (1988) (table).

In October 1988, Graf filed a pro se petition for post-conviction relief, which the Law Division denied by order filed May 25, 1989, without an evidentiary hearing.  Graf appealed.  In

---

[1] This Court will deny Graf's claims to the extent that they are unexhausted or procedurally defaulted on the merits.  See 28 U.S.C. § 2254(b)(2); Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007) ("because we will deny all of Taylor's claims on the merits, we need not address exhaustion"); Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005) ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit.  Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

an opinion filed February 14, 1991, the Appellate Division reversed and remanded for an evidentiary hearing.  See State v. Graf, No. A-5987-88T4 slip op. (N.J. App. Div., Feb. 14, 1991).

After conducting an evidentiary hearing, the Law Division denied post-conviction relief by order filed January 22, 1992. Graf appealed.  In an opinion filed February 6, 1996, the Appellate Division affirmed this order denying post-conviction relief.  See State v. Graf, No. A-2928-92T4 slip op. (N.J. App. Div., Feb. 6, 1996).  The New Jersey Supreme Court denied certification on May 23, 1996.  See State v. Graf, 144 N.J. 589 (1996) (table).

Graf timely filed his first § 2254 petition in this Court in 1997.  See Graf v. Pinchak, No. 97-1098 (MLC) (D.N.J. filed 2-24-1997).  On October 31, 1997, this Court found that three out of seven grounds had not been exhausted before the New Jersey state courts, dismissed the Petition without prejudice as a mixed petition, and denied a certificate of appealability.

On January 21, 1998, Graf filed his second pro se petition for post-conviction relief in the Law Division.  Graf challenged the admission of a badge and a bloody jacket in evidence at trial, and claimed that his identification was unconstitutional because it was based on a suggestive lineup.  On February 5, 1998, the Law Division denied post-conviction relief, finding that Graf's claims (which this Court found had not been exhausted

3

as federal issues) were procedurally barred by New Jersey Court
Rules.  Graf appealed.  In an opinion filed June 26, 2000, the
Appellate Division affirmed for the reasons set forth by the Law
Division, but added that Graf's claim that post-conviction relief
counsel was ineffective was without merit.  See State v. Graf, No.
A-3434-98T4 slip op. (N.J. App. Div., June 26, 2000).  On June 6,
2001, the New Jersey Supreme Court denied Graf's petition for
certification.  See State v. Graf, 169 N.J. 605 (2001) (table).

On June 13, 2001, Graf executed his second § 2254 Petition.
The Clerk of this Court received it on June 25, 2001, with Graf's
application to proceed in forma pauperis.  The Court notified
Graf of the consequences of filing such a Petition, and gave him
an opportunity to withdraw the Petition and file one all-
inclusive Petition, pursuant to Mason v. Meyers, 208 F.3d 414 (3d
Cir. 2000).  Graf withdrew the original Petition and filed an
Amended Petition [docket entry #12] on August 30, 2001.  In their
Answer, Respondents argued that the Petition was time-barred.  By
Opinion and Order entered December 22, 2003, this Court dismissed
the Amended Petition as untimely but granted a certificate of
appealability.  Graf appealed.  In an Opinion filed January 30,
2007, the Court of Appeals for the Third Circuit reversed and
remanded for a decision on the merits.

The Amended Petition, which was remanded to this Court for a
decision on the merits, raises six grounds:

4

**Ground One:** DEFENDANT'S INVOKED RIGHT TO COUNSEL WAS VIOLATED BY POLICE INITIATED QUESTIONS AND HIS STATEMENTS WERE OBTAINED WITHOUT DEFENDANT HAVING MADE A VALID AND VOLUNTARY WAIVER OF HIS RIGHT TO COUNSEL; THEREFORE, THE STATEMENTS SHOULD HAVE BEEN SUPPRESSED.

Supporting Facts: Defendant stated that he did not want to talk to anyone any further, he wanted to speak to an attorney.  That request was followed by a statement by Lt. Lucia of the Prosecutor's Office that, we cannot supply you with an attorney when you are taken to the County Jail if you can't afford one you can apply for a Public Defender.  At this point in time defendant was not charged with a crime.  A subsequent statement was taken approx. five (5) hours later and in court it was the defendant's word against the interrogating officer as to who initiated the conversation.

**Ground Two:** THE TRIAL JUDGE ERRED IN HIS DECISION OF THE MIRANDA HEARING BY MISINTERPRETING THE FACTS.

Supporting Facts: The police testified that defendant was read his rights verbatim after his first statement but they did not read them verbatim before his third statement which came after defendant's request for counsel was not honored.  In the Judge's decision he stated that he found defendant was not read his rights verbatim after his first statement, but they were read verbatim before his confession, reversing the actual order of the statements.

**Ground Three:** POLICE UTILIZED A SUGGESTIVE LINE-UP PROCEDURE BY REMOVING THE ONLY PERSON WHO CLOSELY RESEMBLED THE DEFENDANT.  THEREBY, CREATING A SUGGESTIVE LINE-UP AND VIOLATING THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

Supporting Facts: An investigator for the prosecutor reviewed all the participants in a holding cell prior to the line-up, then removed the one person that resembled the defendant in height, weight and hairstyle, leaving others that were at least five (5) inches taller than the defendant.  When asked about it in court, the investigator denied ever seeing the line-up participants beforehand.

**Ground Four:** INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

Supporting Facts: There was a police sergeant in the police Dept. at the time defendant was interrogated and defendant believes he would have testified that

5

defendant was being interrogated for one and a half hours, after his request for counsel.  Also, there was a person removed from the pre-trial line-up that could have shown that the investigator that removed him from the line-up group lied about tampering with the line-up. These were two crucial points in the case and the trial attorney did not fully investigate or call either witness to support the defendant's claims.

**Ground Five:** THE COURT ERRED IN ALLOWING A BADGE, THAT WAS TAKEN FROM DEFENDANT'S RESIDENCE, INTO EVIDENCE SINCE IT WAS NOT HANDED OVER TO THE PROSECUTOR'S OFFICE UNTIL FIVE (5) MONTHS LATER.  IN VIOLATION OFF THE 4TH AND 14TH AMENDMENTS OF THE CONSTITUTION OF THE UNITED STATES.

Supporting Facts: A police officer took a badge belonging to the defendant during a search of the defendant's residence for his own purpose.  When the prosecutor needed to link a piece of evidence to the defendant, this officer, who still had the badge in his possession five (5) months later, claimed that he found the badge in the same drawer as a 22 cal. bullet they wanted to use as evidence.

**Ground Six:** THE COURT ERRED BY ALLOWING THE DEFENDANT'S JACKET INTO EVIDENCE SINCE THE PREJUDICIAL VALUE OUTWEIGHED THE PROBATIVE VALUE IN VIOLATION OF HIS FOURTH AND FOURTEENTH AMENDMENT RIGHTS.  DEPRIVING HIM OF DUE PROCESS OF LAW AND A FAIR TRIAL.

Supporting Facts: Defendant's jacket had blood stains on it that could not be typed, the prosecutor could only say that it was of human origin.  There was no evidence that this jacket was worn by the defendant on the day of the crime.  Even a state witness that attended the physical line-up testified that the defendant wasn't wearing a jacket.

(Am. Pet., ¶¶ 12.A. - 12.F.)

## II.  DISCUSSION

A habeas corpus petition must meet "heightened pleading requirements."  McFarland v. Scott, 512 U.S. 849, 856 (1994) (citing 28 U.S.C. § 2254 Rule 2(c)).  The petition must state all the grounds for relief available to the petitioner, the facts

supporting each ground, and the relief requested.  See Section
2254 R. 2(c)(1)-(3).

A court has jurisdiction to entertain a habeas petition
challenging a state conviction or sentence only where the
inmate's custody violates federal law:

> [A] district court shall entertain an application for a
> writ of habeas corpus in behalf of a person in custody
> pursuant to the judgment of a State court only on the
> ground that he is in custody in violation of the
> Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

## A.   Standard of Review for Claims Adjudicated on Merits

A federal court may address habeas relief when a state court
has adjudicated a federal claim on the merits.  See 28 U.S.C. §
2254(d).  "An adjudication on the merits has a well settled
meaning: a decision finally resolving the parties' claims, with
res judicata effect, that is based on the substance of the claim
advanced, rather than on a procedural, or other, ground."
Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004) (cites and
quotes omitted), rev'd on other grounds, 545 U.S. 374 (2005); see
Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006) ("because the
PCRA appellate court found that Vargas was not willing to testify
at the guilt phase of Rolan's trial, its decision to deny habeas
relief on that basis constituted an adjudication on the merits").
A state court may render an adjudication on the merits of a
federal claim by rejecting the claim without any discussion.  See

Rompilla, 355 F.3d at 247.  But "[i]f the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply, and federal courts undertake a de novo review of the claim."  Rolan, 445 F.3d at 678.

Where a federal claim was adjudicated on the merits in state court, the writ will be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination in light of the evidence before the state court. See 28 U.S.C. § 2254(d).  Specifically, § 2254(d) provides:

> (d) An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.   Section 2254(d)(1)

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412

8

(2000); see Carey v. Musladin, 127 S.Ct. 649, 653 (2006) ("federal habeas relief may be granted here if the California Court of Appeal's decision was contrary to or involved an unreasonable application of this Court's applicable holdings").  A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases", or "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result."  Williams, 529 U.S. at 405-06.

Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  The Court in Carey v. Musladin reversed the grant of a writ, holding that where "[n]o holding of this Court required the California Court of Appeal to apply the test of Williams and Flynn to the spectators' conduct . . . , the state court's decision was not contrary to or an unreasonable application of clearly established federal law."  Carey, 127

S.Ct. at 654.[2]  Also, whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.  Id. at 409-10; see Thomas v. Varner, 428 F. 3d 491, 497 (3d Cir. 2005).[3] Thus, "[t]he federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent."  Outten v. Kearney, 464 F.3d 401, 414 (3d Cir. 2006) (cite and quotes omitted).

   **2.   Section 2254(d)(2)**

   Section 2254(d)(2) precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting

---

   [2] See Wright v. Van Patten, 128 S.Ct. 743, 747 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law") (cite and quotes omitted).

   [3] "[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent."  Marshall v. Hendricks, 307 F.3d 36, 71 n.24 (3d Cir. 2002) (cites and quotes omitted).

the presumption of correctness by clear and convincing evidence."
28 U.S.C. § 2254(e)(1); see Miller-El v. Dretke, 545 U.S. 231, 240
(2005) (district court must "presume the [state] court's factual
findings to be sound unless [petitioner] rebuts the 'presumption
of correctness by clear and convincing evidence.'")  Thus, once a
court concludes that there are state court factual findings to
which it must defer under § 2254(e)(1), a "District Court should
[] review[] those findings to ascertain whether or not they were
reasonable" under 28 U.S.C. § 2254(d)(2).  Rolan, 445 F.3d at 681.
A state court factual determination is reasonable in light of the
evidence presented in the state court under § 2254(d)(2) where
"[r]easonable minds reviewing the record might disagree" on the
factual finding.  Rice v. Collins, 126 S.Ct. 969, 976 (2006); but
see Rolan, 445 F.3d at 681 (Pennsylvania court's finding that
exculpatory witness was not willing to testify on behalf of Rolan
was objectively unreasonable under § 2254(d)(2) "because it was
not supported by the record" before the Pennsylvania court).

**B.   Miranda Claims**

Graf raises Miranda claims in Ground One and Ground Two.
See supra p. 5.  The claim in Ground One - the admission of
Graf's statements violated the Self-Incrimination Clause because
the police questioned him after he had invoked his right to
counsel and without a valid waiver of Miranda - is governed by §
2254(d)(1), as it involves a legal issue.  The claim in Ground

Two, which challenges the state courts' factual determinations, is governed by § 2254(d)(2).

No person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination. See Malloy v. Hogan, 378 U.S. 1, 8 (1964). In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467. When police question a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and thus excluded from evidence at trial in the State's case in chief. See Oregon v. Elstad, 470 U.S. 298, 317 (1985). Thus, a confession taken during a custodial interrogation without the provision of Miranda warnings violates the privilege against self-incrimination. "To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the Miranda Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." See Thompson v. Keohane, 516 U.S. 99, 107 (1995).

12

"If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." <u>Miranda</u>, 384 U.S. at 474.  "<u>Miranda</u> thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." <u>Edwards v. Arizona</u>, 451 U.S. 477, 481 (1981).[4]

But the accused may waive the right to counsel, even after invoking that right, provided the waiver "constitute[s] a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" <u>Miranda</u>, 384 U.S. at 482 (quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938)).  A waiver inquiry has two parts:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of

---

[4] <u>Compare</u> <u>Davis v. United States</u>, 512 U.S. 452, 461 (1994) (holding police not required to stop questioning suspect after he remarked, "Maybe I should talk to a lawyer" because, "after a knowing and voluntary waiver of the <u>Miranda</u> rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney") <u>with</u> <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1041-42 (1983) ("I do want an attorney before it goes very much further"); <u>Edwards</u>, 451 U.S. at 479 ("I want an attorney before making a deal").

comprehension may a court properly conclude that the
Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (cites and quotes

omitted).

This inquiry requires a court:

to consider the totality of the circumstances
surrounding the interrogation, which includes examining
the events that occurred and the background, experience,
and conduct of the defendant.  Miranda rights will be
deemed waived only where the totality of the
circumstances "reveal[s] both an uncoerced choice and
the requisite level of comprehension."

Reinert v. Larkins, 379 F.3d 76, 88 (3d Cir. 2004) (quoting

Moran, 475 U.S. at 421) (cites omitted).

Graf presented Ground One on direct appeal.  Relying on

Edwards v. Arizona, 451 U.S. at 484-85, the New Jersey Appellate

Division rejected the claim based on the trial court's factual

finding that Graf initiated the conversation with police (after

he had requested counsel and interrogation had ceased), and

thereafter voluntarily waived his Miranda rights:

Although defendant claims that statements were
unconstitutionally taken after he had requested counsel,
the trial judge properly could have believed that any
conversations after defendant's request for counsel were
initiated by defendant and that he had been fully
readvised of his Miranda rights. [note 1] Edwards v.
Arizona, 451 U.S. 477, 484-485 . . . State v. McCloskey,
90 N.J. 18, 28 (1982).

[note 1] Defendant's claim that he was induced to
confess by the police because they were so kind to him
is ludicrous.  Defendant was awaiting a police
appointment in two communities and had family on the
force in a neighboring town.  He was friendly with the
local police and municipal officials who were solicitous
of both his rights and feelings.  We have no question

14

concerning the voluntariness of his confession and the
knowing and intelligent waiver of his rights.

State v. Graf, Docket No. A-3940-85T4 slip op., p. 3 (N.J. App.

Div., April 14, 1988).

The Law Division made findings of fact on the self-
incrimination claim after conducting a two-day evidentiary

hearing.  Nine witnesses, including Graf and the police officers

involved in the taking of three statements, testified.  After

hearing these witnesses, the Law Division Judge found as follows:

> I find the defendant was in fact advised of his Miranda
> rights initially by Chief O'Hare and subsequently by the
> police officers who took statements from him.  Each
> statement recites that the defendant has been advised of
> his constitutional rights . . . .
>
> There is no question in this Court's mind but that the
> defendant did, in fact, request an attorney in the
> presence of Mr. McCool and Investigator Lucia.
> Following that, all questioning stopped.  Thereafter, it
> was the defendant who initiated further discussions with
> the police.  And I find that he knowingly and
> intelligently waived the right that he had previously
> invoked.  There, the subsequent statements of the
> defendant are admissible.  Edwards v. Arizona, 451 U.S.
> 485.  In conclusion, I find that the three statements
> made by the defendant are admissible in evidence.

State v. Graf, Ind. No. 945-85 transcript, pp. 12-14 (N.J.

Super., Law Div., Jan. 27, 1986).

In rejecting Graf's Self-Incrimination Clause claim, the New

Jersey courts relied on Edwards v. Arizona, which held:

> when an accused has invoked his right to have counsel
> present during custodial interrogation, a valid waiver
> of that right cannot be established by showing only that
> he responded to further police-initiated custodial
> interrogation even if he has been advised of his rights.
> We further hold that an accused, such as Edwards, having

15

> expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police . . . .
>
> [W]e do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel.

451 U.S. at 484-86 (footnotes omitted).

In Smith v. Illinois, 469 U.S. 91, 95 (1984), the Supreme Court emphasized that the rule announced in Edwards

> embodies two distinct inquiries.  First, courts must determine whether the accused actually invoked his right to counsel.  See , e.g., Edwards . . . (whether accused "expressed his desire" for, or "clearly asserted" his right to, the assistance of counsel; Miranda . . . (whether accused "indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking").  Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

Id.

For instance, in Oregon v. Bradshaw, 462 U.S. 1039 (1983), a police officer terminated the conversation when Bradshaw stated that he wanted an attorney.  Id. at 1041-42.  Bradshaw then asked a police officer later that day, "Well, what is going to happen to me now?"  Id.  The Supreme Court determined that the confession was admissible because Bradshaw initiated the conversation with police and waived his Miranda rights after he requested counsel.  Id. at 1046.

16

In Connecticut v. Barrett, 479 U.S. 523 (1987), Barrett told the officers during a custodial interrogation that he "was willing to talk about [the incident] verbally but he did not want to put anything in writing until his attorney came." Id. at 526. The Supreme Court held that the admission of Barrett's subsequent verbal confession did not violate the Fifth Amendment or Miranda because the confession was not in writing.  Thus, under Barrett, police may continue to interrogate a suspect who has made only a limited request for counsel, provided the suspect is willing to continue to talk to police without counsel.  The Supreme Court explained its rationale:

> It is undisputed that Barrett desired the presence of counsel before making a written statement.  Had the police obtained such a statement without meeting the waiver standards of Edwards, it would clearly be inadmissible.  Barrett's limited requests for counsel, however, were accompanied by affirmative announcements of his willingness to speak with the authorities.  The fact that officials took the opportunity provided by Barrett to obtain an oral confession is quite consistent with the Fifth Amendment.  Miranda gives the defendant a right to choose between speech and silence, and Barrett chose to speak . . . .  Here . . . Barrett made clear his intentions, and they were honored by police.  To conclude that respondent invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of respondent's statement . . . .  We also reject the contention that the distinction drawn by Barrett between oral and written statements indicates an understanding of the consequences so incomplete that we should deem his limited invocation of the right to counsel effective for all purposes.

Barrett, 479 U.S. at 529-30 (footnotes omitted).

17

The New Jersey courts determined here that the police stopped interrogating Graf when he requested counsel; Graf thereafter initiated discussion with police; Graf thereafter knowingly and voluntarily waived his rights to the presence of counsel and to remain silent.  In light of these factual findings, this Court concludes that the adjudication of Graf's Self-Incrimination Clause claim by the New Jersey courts is neither contrary to, nor an unreasonable application of, Edwards, Miranda and other Supreme Court precedent.

Concerning Ground Two, see supra p. 5, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  The trial court here conducted an evidentiary hearing during which Graf admitted that he signed the written Miranda waiver form before making his first written statement.  Graf testified on cross-examination that he had recently studied Miranda in law enforcement courses he had taken at a community college, and that he understood his Miranda rights.  Although Graf testified that the police initiated further interrogation after he had invoked his right to counsel, the police officers involved testified that Graf initiated these discussions.  Specifically, Chief O'Hare, Mauro Corvasce, Thomas Manzo and Philip George testified that Graf initiated the

18

conversations with Corvasce (after Graf had requested counsel and interrogation had ceased) leading to the second and third statements, and that before he made the second and third statements, an officer again advised Graf of his <u>Miranda</u> rights. Although Graf testified that he continued to ask for an attorney after the police initiated further discussion, the police officers testified that Graf did not request counsel after he re-initiated discussion, and that Graf knowingly waived his rights, as stated in the second and third written statements.  Graf admitted that he signed the second and third statements, and that the third statement (the most incriminating one) specifies that he was advised of his constitutional rights, which he waived, and that he was willing to discuss the events on May 30, 1985 (the date of the murder).

Graf essentially argues that the trial judge's findings of fact were unreasonable because the judge believed the police rather than Graf as to who initiated discussion about the murder and robbery after Graf had invoked his right to counsel and interrogation had ceased.  In this regard, <u>Rice v. Collins</u>, 546 U.S. 333 (2006), is applicable to the issue of credibility.  In <u>Rice</u>, the Supreme Court reversed the Ninth Circuit's determination that the state courts had unreasonably credited the prosecutor's race-neutral reasons for striking a young African-American woman from the panel (her youth, her demeanor and lack of community ties).  The Court reasoned:

> Viewing the panel majority's concerns together, the most generous reading would suggest only that the trial court had reason to question the prosecutor's credibility regarding Juror 16's alleged improper demeanor.  That does not, however, compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications and conclude Collins had shown a <u>Batson</u> violation.  Reasonable minds viewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.

<u>Id.</u> at 341-42.

This Court concludes that the New Jersey courts did not unreasonably determine the facts in view of the evidence presented during the <u>Miranda</u> evidentiary hearing.  Thus, Graf is not entitled to habeas relief pursuant to § 2254(d)(2) on Ground Two.

**C.   Suggestive Identification**

Concerning Ground Three, <u>see</u> <u>supra</u> p. 5, improper pretrial identification procedures by police may cause witnesses to misidentify a criminal.  Thus, "the witness thereafter is apt to retain in his memory the image of the [misidentification] rather than that of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."  <u>Simmons v. United States</u>, 390 U.S. 377, 383-84 (1968).  It "is, first of all, apparent that the primary evil to be avoided is a very substantial likelihood of irreparable misidentification."  <u>Id.</u> at 384.  "It is the likelihood of misidentification which violates a defendant's right to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of

20

misidentification." Neil v. Biggers, 409 U.S. 188, 198 (1972).
But a suggestive identification procedure does not violate due
process so long as the identification possesses sufficient
aspects of reliability, Manson v. Brathwaite, 432 U.S. 98, 106
(1977), for reliability is the "linchpin in determining the
admissibility of identification testimony". Id. at 114; see
United States v. Wise, 515 F.3d 207, 215 (3d Cir. 2008); United
States v. Brownlee, 454 F.3d 131, 139 (3d Cir. 2006). The
central question is "'whether under the totality of the
circumstances the identification was reliable even though the
confrontation procedure was suggestive.'" Brathwaite, 432 U.S.
at 106 (quoting Biggers, 409 U.S. at 199); see United States v.
Maloney, 513 F.3d 350, 355 (3d Cir. 2008); Brownlee, 454 F.3d at
139; Thomas v. Varner, 428 F.3d 491, 503 (3d Cir. 2005).

Factors to be considered in evaluating the likelihood of
misidentification include "the opportunity of the witness to view
the criminal at the time of the crime, the witness' degree of
attention, the accuracy of the witness' prior description of the
criminal, the level of certainty demonstrated by the witness at
the confrontation, and the length of time between the crime and
the confrontation." Biggers, 409 U.S. at 199. Significantly,
where "identifications were entirely based upon observations at
the time of the [incident] and not at all induced by the conduct"
of the pretrial identification procedures, the identification

does not violate due process.  See Coleman v. Alabama, 399 U.S. 1, 7 (1970).

Graf argues here that his in-court identification by two witnesses was tainted by an impermissibly suggestive line-up identification.  Graf raised this claim before the Law Division judge, who conducted a pre-trial evidentiary hearing to determine whether the line-up identification was impermissibly suggestive. Therein, the officer who selected the five line-up participants (in addition to Graf) testified that he excluded Andrews because Andrews's hairstyle was different from Graf's, even though he allowed four people taller than Graf to participate.  Robert Largey, one witness, testified that he saw the suspect at a distance walking around a vehicle, and up close as the suspect's vehicle went slowly past his vehicle on an extremely narrow roadway, where Largey had to pull to the side to allow the other vehicle to get by.  Largey testified that he had not given the police a height or weight description before the line-up.  The other witness, John Nieradka, testified that he saw the suspect when he walked his dog within three feet of the vehicle that the suspect was standing next to.  Nieradka described a man who was 5 feet, 10 inches tall and weighed 145-150 pounds.  After hearing the testimony, the judge found:

> I find that the witnesses, Mr. Largey and Mr. Nieradka,
> did have an opportunity to observe the individual that
> they later identified at the lineup on the dirt road
> there in Keansburg in the vicinity of the floodgate.

22

Mr. Largey testified that he was going to check on his work crew, but because it was around noon . . . he decided to pull down the road and he himself would have lunch.  At that time he said he could observe an individual around the car.  He heard three or four or five gunshots, cracks I think he described them as, saw an individual get out of the car, run around the car, and go over to the driver's side, open the door, and then bend down.  He was out of sight for about 10 or 15 seconds; then he appeared again, got in the car, and drove it towards Mr. Largey.  Mr. Largey said the automobiles passed on the driver's side, both on the driver's side and he had an opportunity for approximately five seconds . . . to make a clear observation of the individual driving the automobile.  He later found that there was something in the road, and that something in the road was Thomas Lockwood, after the incident . . . .

He was later requested by the Keansburg Police Department to go to the Monmouth County Courthouse and view a lineup.  He was not shown any photographs of the defendant . . . .  He was told to look, take your time.  If you see the individual in the lineup that you had seen there at the beach in Keansburg back on May 30, 1985, tell us.  He said he looked, and he went down the list and he said as soon as I got to Clifford Graf, who was number two, I knew it was him.  I continued to go through the individuals standing there, and just to make sure, he said I went through again.  There is no question in his mind that it was Clifford Graf, and the identification made in court, also, he identified Mr. Graf . . . .

I find absolutely nothing that would be impermissibly suggestive with regard to the selection of the defendant from that lineup with regard to Mr. Largey.

With regard to Mr. Nieradka, he testified that he was walking his dog along the beach, and came within three feet of the defendant at the time that he passed him, and in fact, said hello back.  I should also note that both individuals, and in addition, I should also note that they made observations of redness around the eyes of the defendant, also bearing in mind that these witnesses have been sequestered . . . .  Mr. Nieradka, who walked within three feet of the defendant, continued to walk his dog down along the berm up around and down . . . .  About 20 minutes later he came back, and he did observe the individual that he saw in the driver's side in an injured state.  I have to assume that is Mr.

23

Lockwood that he had seen.  He identified Mr. Lockwood as being, I believe, heavy set, curly hair, with sunglasses on . . . .  Mr. Nieradka did attend the lineup, and also selected Mr. Graf as the individual that he had seen there at Keansburg adjacent to the driver's side of the car and Mr. Nieradka again said that he did not have any problem picking out Mr. Graf. I find, also, that the witnesses were separated, although they rode out with Keansburg Police to the Monmouth County Courthouse and rode back together.  I find that there was no improper contact between these witnesses; that they had any discussions about who they were going to pick out and in fact, even if they did have a discussion, who they picked out, they would have been thwarted in their efforts to dovetail their testimony, or identification, in that Mr. Graf was moved from the second position to the fourth position for the second lineup . . . .

I don't find anything impermissibly suggestive about this particular lineup itself.  I will look at the photographs and the photographs, although individuals are not the exact same height, the exact same weight, that is impossible . . . .  The individuals, as I am looking at them, I can say, perhaps one is somewhat taller than Mr. Graf, but everyone else seems to fall in place.  They all look the same age, that 20-to-23 age group.  They all have longer hair . . . and I find noting impermissibly suggestive.  They are all dressed in Monmouth County Correctional Institution's khakis; they are all white males . . . .

Accordingly, the out-of-court identification of the two witnesses, this Court finds beyond a reasonable doubt was proper, and, therefore, the out-of-court identification, together with the in-court identification, will be permitted.

State v. Graf, Ind. No. 945-85 transcript, p. 105, line 23 to p. 111, line 25 (N.J. Super., Law Div., 1-28-1986).

The New Jersey court's ruling that the identification was reliable was not contrary to, or an unreasonable application of, the factors the Supreme Court requires to be considered in evaluating the likelihood of misidentification.  See Biggers, 409

24

U.S. at 199.  Under these circumstances, the adjudication of Graf's identification claim was not contrary to, or an unreasonable application of, Biggers and other Supreme Court jurisprudence.

**D.   Ineffective Assistance of Counsel**

Graf asserts in Ground Four that trial counsel was ineffective in failing to call a police sergeant to testify at the Miranda hearing (who would have testified that police continued interrogating Graf for an hour and one-half after he requested counsel), and failing to call Mr. Andrews, the person who was removed from the line-up, as a witness.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

Two components must be met for a reversal of a conviction based on a claim that counsel's assistance was defective.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88.  Thus, a "convicted defendant making a claim of ineffective assistance must identify the acts or

25

omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. As the Supreme Court explained,

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.

The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness

26

claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

Graf presented his ineffective assistance of counsel claims in his first petition for post-conviction relief. After the Law Division conducted an evidentiary hearing on remand, the Appellate Division rejected these claims as follows:

> The testimony of defendant, trial counsel and others at the post-conviction relief hearing on remand produced a record providing adequate support for Judge Farren's findings and conclusions that the quality of representation defendant had received at trial did not deny his right to effective counsel, as the nature of that right under the federal Constitution has been articulated in Strickland v. Washington, 466 U.S. 668 . . . and United States v. Cronic, 466 U.S. 648 . . . and absorbed as the prevailing rule under the New Jersey Constitution in State v. Fritz, 105 N.J. 42, 53-58 (1987). Trial court findings and conclusions supported by adequate, substantial and credible evidence are binding on appeal. State v. Johnson, 42 N.J. 146, 161-164 (1964).

State v. Graf, Docket No. A-2928-92T4 slip op. p. 3 (N.J. App. Div., Feb. 6, 1996).

As previously stated, Law Division Judge Farren conducted an evidentiary hearing on remand regarding Graf's ineffective assistance claims. After hearing the testimony of Sergeant Auer (the witness whom Graf claims would have testified that Corvasce continued questioning Graf after he requested counsel) and defense counsel, Judge Farren rejected the claims as follows:

> The defendant contends that his trial counsel was ineffective by failing to investigate the defendant's contention that he had been interrogated for an hour and a half after he invoked his right to counsel and before

27

[he] made the inculpatory statement, found voluntary and admitted at trial.  He asserts that counsel should have secured and presented [the testimony of Sergeant Auer] to corroborate his testimony.  Additionally, he contends that trial counsel failed to call William Andrews as a witness, who would have testified that he was removed from a police lineup, because of his similar appearance to the defendant.

At the hearing in this matter, the defendant contended he was picked up during the late hours of June 6, 1985 and transported to the Keansburg police department.  At 2:30 to 3:00 a.m., while confined there, he advised Detective Lucia of the Monmouth County Prosecutor's Office that he wanted an attorney . . . .  Detective Lucia, allegedly, advised the defendant that he was unable to secure the services of an attorney, as it was Friday and he would have to wait until Monday or Tuesday to apply for one . . . .

The defendant states that Detective Corvasce, of the Keansburg police department, was checking him that evening and when he came to check the defendant at 8:00 a.m., he asked the defendant what he wanted for breakfast and then began to question him concerning the murder until 9:25 to 9:30 a.m.  The defendant contends he told Corvasce, a number of times, he wanted an attorney.  But, Corvasce advised him, he would be better off without a public defender and that he could help - and that he could help him.

It is the defendant's position that during this questioning, Sergeant Auer came into the cell area to advise Detective Corvasce he had to sign the log book.  But Corvasce advised him that he was busy questioning the defendant.  After Auer left the area, the questioning continued until the defendant gave a statement.

The defendant contends that he told his attorney, Steven Rubin, about asking for an attorney, but he continued to be questioned by Detective Corvasce until he gave the statement.  He states that he told Rubin, the only way we could win the "Miranda hearing," was if Sergeant Auer was called to testify.  If called to testify, Auer would state, he checked every one half hour, from 8:00 a.m to 9:22 a.m. and Corvasce was with the defendant all that time in the cell area.  Auer would also testify that he signed Detective Corvasce's name in the log book, which would substantiate his position

\*                   \*                   \*

28

On the issue of the "Wade hearing," the defendant
admitted that a photo of Andrews was marked as an
exhibit and the Court reviewed it, together with a photo
of the actual lineup.  He also admitted that Fred Hogan,
an investigator for the Public Defender's Office and
David Donnelly, a Public Defender, were present at the
lineup and both of them signed off, stating it was a
fair lineup . . . .

In support of his position, the defendant next called his
trial attorney, Steven Rubin . . . .  He felt he had a
good attack on the defendant's statements, as the first
two were exculpatory and the third was inculpatory.  He
questioned what happened in between statements.  He
recalls no specific request of the defendant to call
Sergeant Auer and was not aware that Auer would say what
defendant alleged would be his testimony.  On the <u>Wade</u>
issue, Rubin stated, he covered the removal of Andrews
and does not recall defendant asking him to call Andrews.
He felt he established the fact that people dissimilar
to the defendant were in the lineup.  However, the
Public Defender and his investigator were at the lineup,
signed off on it and the Court found the lineup not to
be "overly suggestive."  Rubin concluded by stating that
the defendant never complained about not calling Auer or
anyone else.

Next, M[auro] Corvasce testified . . . .  He knows the
defendant from Keansburg.  During the early morning
hours of June 7th, he checked on the defendant a number
of times, at the Chief's request.  He states that the
log book entry for 0800 to 0830 is not his writing, nor
the one for 0830 to 0900.  The entry for 0900 to 0915
was his signature.  He stated Sergeant Auer signed his
name, as he was behind the desk where the log book was
located.  As far as any conversation with the defendant,
Corvasce stated, he brought the defendant his breakfast
and the defendant brought up the subject of the homicide
and asked, "What should I do?"  Corvasce advised him, he
was under orders not to talk to him.  Thereafter, the
defendant requested to speak to Chief O'Hare.  Corvasce
called the Chief, who came to headquarters and he, the
Chief and a County detective took the statement of the
defendant.  Corvasce concluded with, "I was just a
gopher in this investigation."

     *     *     *

From the testimony and exhibits before this Court, this
Court finds that the defendant was apprehended the
evening hours of June 6, 1985 and transported to the

Keansburg police department.  That he asked Detective
Lucia for an attorney, but one was not available because
of the day and the hour.  That he was housed in the
Keansburg police department and was checked every half
hour by Dispatcher Hamilton and Detective Corvasce . . .
.  Detective Corvasce did not spend 8:00 a.m. to 9:22
a.m. in the cell questioning the defendant.  When
Corvasce brought the defendant his breakfast at 8:00
a.m., the defendant inquired, "What should I do?" and
Corvasce replied, I can't talk to you.  At this,
defendant requested to speak to Chief O'Hare, who later
appeared with a County detective and the defendant's
statement was taken.

The defendant's testimony, simply, was not credible.
Mr. Rubin had no recollection of defendant's request to
call Auer and in fact, called Mr. Lefoe, Mr. McCool,
defendant's mother and Detective Lucia.  Defendant never
said anything to Rubin about his failure to call Auer .
. . .  Captain Auer did testify that he has no
recollection of seeing Corvasce in the jail cell area
from 8:00 a.m. to 9:22 a.m. and does not know what he
would  have said if called to testify . . .

On the Wade issue, the Court had the benefit of a photo
of Andrews and compared it with the photo of the entire
lineup.  Also, Fred Hogan and Public Defender Donnelly
were physically present at the lineup and found it to be
fair.  Attorney Rubin also covered the removal issue at
the Wade hearing, but the Court found that the lineup
was not overly suggestive . . .

State v. Graf, Ind. No. 945-85 transcript, pp. 2-11 (N.J. Super.,

Law Div., Jan. 22, 1992).

Given the New Jersey courts' factual findings, which are

presumed to be correct, this Court concludes that the adjudication

of Graf's ineffective assistance of counsel claims was not

contrary to, or an unreasonable application of, Strickland.

## E.    Admission of Badge and Jacket

In Ground Five and Ground Six, Graf argues that admission of

the Harbor Commission badge and blood-stained jacket violated the

Fourth Amendment and the Due Process Clause of the Fourteenth

Amendment.  See supra p. 6.

Graf argues in his Reply Brief that admission of the Harbor

Commission badge violated his constitutional rights because there

was no probable cause to seize the badge, and the police failed

to include the badge in the inventory of seized items.  (Graf's

Reply at 25-26.)  Respondents argue that admission of the badge

did not violate the Fourth Amendment because the badge was seized

in accordance with a lawfully acquired search warrant based on

probable cause.  Respondents argue that the admission of the badge

complied with due process, as the trial court properly determined

that the state established the chain of custody at trial and the

state introduced the badge on redirect examination of Corvasce

after Graf's attorney asked about it on cross-examination.

The Supreme Court concluded in Stone v. Powell, 428 U.S. 465

(1976), that

> where the State has provided an opportunity for full and
> fair litigation of a Fourth Amendment claim, a state
> prisoner may not be granted federal habeas corpus relief
> on the ground that evidence obtained in an
> unconstitutional search or seizure was introduced at his
> trial.  In this context the  contribution of the
> exclusionary rule, if any, to the effectuation of the
> Fourth Amendment is minimal, and the substantial
> societal costs of application of the rule persist with
> special force.

Id. at 494-95 (footnotes omitted).

Graf had a full and fair opportunity to present his Fourth

Amendment claim to the New Jersey courts.  Even though the badge

was not listed on the inventoried return of the search warrant
and the state did not introduce the badge until redirect
examination of Corvasce (after Graf's counsel had raised it on
cross-examination), Graf's counsel could have moved to suppress
the badge on Fourth Amendment grounds.  As the Court of Appeals
for the Third Circuit concluded in another § 2254 case,

> We agree with the Pennsylvania Supreme Court that
> Hubbard had a full and fair opportunity to present his
> claim to the state courts. His counsel was aware of the
> interview and of the need to make suppression motions
> before the commencement of trial. He could have reviewed
> statements Hubbard made to the police that might have
> acknowledged receipt of the warnings. He could have
> questioned Hubbard or his parents about whether Miranda
> warnings were given. Counsel had all the resources at
> his command to investigate and present a Fourth
> Amendment claim at the proper time. The failure to do so
> was not brought about by any restriction of the
> opportunity by the state courts.

Hubbard v. Jeffes, 653 F.2d 99, 103 (3d Cir. 1981).

This Court finds that Graf had a full and fair opportunity
to litigate his Fourth Amendment claims and that, under Stone v.
Powell, the Fourth Amendment claims presented in Ground Five and
Ground Six are not cognizable in this proceeding.

Graf also argues in Ground Six that the admission of the
blood-stained jacket violated due process because there was no
evidence that the blood was the victim's or that Graf was wearing
the jacket on the day of the murder, and the prejudicial value
outweighed the probative value.

Graf raised these claims on direct appeal.  The Appellate
Division rejected the claims:

>The evidence points raised by defendant concerning admission of his badge and jacket were adequately answered by the trial judge.  The State explained why defendant's Harbor Commission badge was not in the inventory, and its existence was first raised by the defense.  The bloodstained jacket was not prejudicial, since defendant admitted to entering the car after the passenger was shot.

State v. Graf, Docket No. A-3940-85T4 slip op., pp. 3-4.

The "Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).  The Supreme Court held in Estelle v. McGuire, 502 U.S. 62 (1991), that the state court's admission in petitioner's trial for murdering his infant daughter of the testimony of two physicians that the child had suffered child abuse (evidence of rectal tearing that was six weeks old and rib fractures that were seven weeks old) did not violate due process because the evidence was relevant to intent:

>The evidence of battered child syndrome was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point.  Concluding, as we do, that the prior injury evidence was relevant to an issue in the case, we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial.  We hold that McGuire's due process rights were not violated by the admission of the evidence.

Id. at 70.

It is true that the admission of evidence may violate due process where the evidence "undermine[d] the fundamental fairness of the entire trial." Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001); see Lesko v. Owens, 881 F.2d 44, 51 (3d Cir. 1989) ("erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation"); Bisaccia v. Att'y Gen. of State of N.J., 623 F.2d 307, 313 (3d Cir. 1980) (when "probative value of . . . evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law").  But this Court is not aware of any Supreme Court case clearly establishing that the admission of prejudicial evidence is a violation of federal constitutional rights, and relevant Supreme Court case law suggests the contrary.  See, e.g., Estelle, 502 U.S. at 70 (rejecting due process challenge to admission of evidence of prior injuries in trial for infant murder); Spencer v. Texas, 385 U.S. 554 (1967) (rejecting due process challenge to admission of evidence of prior similar crimes when judge gives limiting instruction).  Because the admission of the badge and jacket was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, Graf is not entitled to habeas relief under the due process claims in Ground

34

Five and Ground Six.  <u>See</u> <u>Minett v. Hendricks</u>, 135 Fed.Appx. 547 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent).

**F.   Certificate of Appealability**

The Court denies a certificate of appealability.  Graf has not made "a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).  <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003).

### III.   CONCLUSION

Based on the foregoing, the Court will dismiss the Petition and deny a certificate of appealability.

                                    s/ Mary L. Cooper
                              **MARY L. COOPER**
                              United States District Judge

Dated:  November 10, 2008